J-A19018-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| DARIEN MCPHERSON | |
| Appellee | No. 1446 EDA 2015 |

Appeal from the Order Entered April 10, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0013625-2014
CP-51-CR-0013652-2014

BEFORE:  FORD ELLIOTT, P.J.E., OTT, J., and FITZGERALD, J.[*]

MEMORANDUM BY OTT, J.:                    **Filed October 5, 2016**

The Commonwealth brings this appeal from the order entered April 10, 2015, in the Court of Common Pleas of Philadelphia County, granting the suppression motion filed by Darien McPherson.[1]  The Commonwealth raises the following issue:  "Did an experienced police officer have reasonable suspicion to detain [McPherson] where the officer was responding to reports of a gunpoint robbery in progress, minutes earlier, in a high crime area, a bystander pointed to [McPherson's] location, and [McPherson] matched the

_____

[*] Former Justice specially assigned to the Superior Court.

[1] The Commonwealth has certified in the notice of appeal that the trial court's order terminates or substantially handicaps the prosecution. Thus, this appeal is properly before this court. **See** Pa.R.A.P. Rule 311(d).

description of the armed suspect?" Commonwealth's Brief, at 5.[2] Based

upon the following, we affirm.

The trial court has summarized the facts of this case, as follows:

On September 29, 2014, Sergeant David Armstrong was on duty when he received a radio call at 8:18 pm concerning a person with a gun in the area of Frankford Avenue and Orleans Street in Philadelphia. The Sergeant described that section of the city as a high-crime, high-narcotics area where he had made at least a half dozen gun arrests. The radio call contained flash descriptions of two black males. One was described as tall, wearing a white shirt and blue jeans. The second male was said to be shorter, wearing a red or orange shirt, and blue jeans. Less than a minute later, Sergeant Armstrong received a second radio call about a robbery in progress. The same flash description for two black males was given. Sergeant Armstrong responded to the calls, drove to the area of Frankford Avenue and Orleans Street, and began to look for the two males. While searching on Emerald Street, Sergeant Armstrong saw an unknown man point a finger down Stella Street towards Frankford Avenue. The sergeant interpreted this as indicating that someone matching the flash description was heading in that direction.

Sergeant Armstrong's search continued to the 2000 block of Bellmore Street, where he observed Mr. McPherson, whom Sergeant Armstrong estimated to be about six feet, six inches tall. Mr. McPherson was wearing a white t-shirt and blue jeans. Mr. McPherson was walking eastbound on Bellmore Street accompanied by a black female. Around 8:25 pm, Sergeant Armstrong drove up to Mr. McPherson, exited the patrol car and immediately grabbed Mr. McPherson by the rear belt area of his pants. After grabbing Mr. McPherson, Sergeant Armstrong observed the butt of a handgun protruding from the rear pocket of Mr. McPherson's pants. An Officer Perez pulled up to the area during the stop. Upon seeing Officer Perez, Mr. McPherson

_____

[2] Although not ordered by the trial court, the Commonwealth, on May 8, 2015, filed a Pa.R.A.P. 1925(b) statement of matters complained of on appeal.

attempted to flee. After a short struggle, Sergeant Armstrong and Officer Perez placed Mr. McPherson in custody and seized from him the handgun Sergeant Armstrong had seen only after grabbing Mr. McPherson, one packet of heroin, and one packet of cocaine. Further investigation cleared Mr. McPherson as a suspect in the alleged robbery and two other males were apprehended as suspects.

Trial Court Opinion, 11/9/2015, at 1–2.

Our standard of review is well-settled:

When reviewing the propriety of a suppression order, an appellate court is required to determine whether the record supports the suppression court's factual findings and whether the inferences and legal conclusions drawn by the suppression court from those findings are appropriate. Where the defendant prevailed in the suppression court, we may consider only the evidence of the defense and so much of the evidence for the Commonwealth as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. However, where the appeal of the determination of the suppression court turns on allegations of legal error, "the suppression court's conclusions of law are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts."

*Commonwealth v. Peterson*, 17 A.3d 935, 937 (Pa. Super. 2011) (citation and internal citations omitted).

There are three levels of interactions between citizens and police officers: a mere encounter, an investigative detention, and a custodial detention or an arrest. *Commonwealth v. Coleman*, 19 A.3d 1111, 1115

- 3 -

(Pa. Super. 2011).  Here, the parties do not dispute that police conducted an investigatory detention.[3]  An investigatory detention or "*Terry*"[4] stop "is temporary … and does not possess the coercive conditions consistent with a formal arrest. Since this interaction has elements of official compulsion it requires reasonable suspicion of unlawful activity."  *Id.* at 1115 (citation omitted).

> The police are permitted to stop and briefly detain citizens only when they have reasonable suspicion, based on specific and articulable facts, that criminal activity may be afoot. *Commonwealth v. Zhahir*, 561 Pa. 545, 552, 751 A.2d 1153, 1156 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 21, 30, 88 S. Ct. 1868, 1884, 20 L. Ed. 2d 889 (1968)); *Commonwealth v. Melendez*, 544 Pa. 323, 328, 676 A.2d 226, 228 (1996); *Commonwealth v. Hicks*, 434 Pa. 153, 160, 253 A.2d 276, 280 (1969). In determining whether reasonable suspicion exists for an investigative detention, or as it is also known in the common legal vernacular, a "*Terry* stop," the inquiry is the same under both the Fourth Amendment of the United States Constitution and Article 1, § 8 of the Pennsylvania Constitution. *Commonwealth v. Cook*, 558 Pa. 50, 57, 735 A.2d 673, 677 (1999); *Commonwealth v. Jackson*, 548 Pa. 484, 488, 698 A.2d 571, 573 (1997). "The fundamental inquiry is an objective one, namely, whether 'the facts available to the officer at the moment of the intrusion warrant a man of reasonable caution in the belief that the action taken was appropriate.'" *Zhahir, supra*, at 552, 751 A.2d at 1156 (citing *Terry, supra*, 392 U.S. at 21-22, 88 S. Ct. at 1880). In order to determine whether the police had a reasonable suspicion to subject an individual to an investigative detention, the totality of the factual circumstances which existed at the time of the investigative detention must be considered. *Id.* (citing *United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 695, 66 L. Ed. 2d 621 (1981)). "Among the

_____

[3] *See* N.T., 4/10/2015, at 28, 40.

[4] *Terry v. Ohio*, 392 U.S. 1 (1968).

factors to be considered in establishing a basis for reasonable suspicion are tips, the reliability of the informants, time, location, and suspicious activity, including flight." ***Commonwealth v. Gray***, 2001 PA Super 262, 784 A.2d 137, 142 (Pa.Super. 2001).

***Commonwealth v. Ayala***, 791 A.2d 1202, 1208 (Pa. Super. 2002).

Here, the trial court determined police had no reasonable suspicion to

stop McPherson:

In this case, the stop of Mr. McPherson was based on two anonymous phone calls that provided general descriptions of the height, race, and clothing of two black men who allegedly possessed a gun and were involved in a robbery. In addition, Sergeant Armstrong observed an unknown man point his finger in the direction of Frankford Avenue. Both calls provided the same amount of information except that the second caller indicated that individuals of the same description were involved in a robbery in progress.

The point of finger by the unknown male is of de minimis value in the totality of the circumstances analysis. The unknown male pointed in a general direction and not at Mr. McPherson. The record does not reflect why the unknown male pointed, or if he had witnessed any criminal or suspicious activity. Even if the unknown male saw a tall black male in jeans and a white t-shirt on the streets of Philadelphia, it does not corroborate the alleged criminal activity in the anonymous calls. Therefore, independent corroboration was required. ***See Com. v. Hawkins***, 692 A.2d 1068, 1070-71 (Pa. 1997). ("[S]ince there is no gun exception to the ***Terry*** requirement for reasonable suspicion of criminal activity, in the typical anonymous caller situation, the police will need an independent basis to establish the requisite reasonable suspicion.")

Mr. McPherson was observed walking down the block and not engaged in any activity that could be described as suspicious. Since the attempted flight and the observation of the gun did not occur until after Sergeant Armstrong grabbed Mr. McPherson, it does not factor into the reasonable suspicion analysis because the only relevant facts are the ones available to the officer immediately *before* the stop. ***See [Commonwealth v.] Gray***,

> 784 A.2d [137, 142 (Pa. Super. 2001)]. While the events in question occurred in a high-crime area, this factor alone is an insufficient basis for a **Terry** stop unless coupled with circumstances such as suspicious activity or flight by Mr. McPherson. **See [In the Interest of] M. D.**, 781 A.2d [192, 197 (Pa. Super. 2001)] (explaining when a combination of innocent facts can give rise to reasonable suspicion). In short, Sergeant Armstrong's investigation produced no reason to stop Mr. McPherson independent of the anonymous phone calls and an unexplained point of finger.

Trial Court Opinion, 11/6/2015, at 4–5.

The Commonwealth asserts that the trial court "focused on the fact that the stop was purportedly based upon 'two anonymous phone calls,' [b]ut the sergeant testified that an officer went to the location of the robbery and sent out a 'flash' regarding the crime." Commonwealth's Brief at 15. The Commonwealth argues "[Sergeant] Armstrong stopped [McPherson] after that flash was sent out. While the individual the officer encountered was not named at the suppression hearing, the fact that information was supplied in person substantially enhanced its reliability." **Id.** at 15, *citing* **In the Interest of D.M.** 727 A.2d 556, 558 (Pa. 1999); **Commonwealth v. Barber**, 889 A.2d 587, 593 (Pa. Super. 2005).

The Commonwealth further claims, "even assuming arguendo that all of the calls were 'anonymous,' the stop was still entirely proper" because "[a]nonymous tips may be relied upon to support an investigatory stop where police have corroborating information which, in combination, establishes a reasonable suspicion of criminal activity." **Id.** at 16. We address these arguments sequentially.

The Commonwealth contends, "In the first place, Sergeant Armstrong testified that one of the reports regarding the crime was issued by a police officer at the scene, which is a more reliable source of information than an anonymous tip." Commonwealth's Brief at 22, *citing* N.T., 4/10/2015, at 18. The Commonwealth points to Sergeant Armstrong's cross-examination, testimony where he stated:

> A There were multiple radio calls, Your Honor. There was also an officer that arrived on location with the complainant that put out an additional flash. The complainant was brought to the location, but he was negatively ID'd for the robbery and the person with a gun call.
>
> Q After my client was already in custody, the complainant arrived on the scene?
>
> A An officer was on location with the complainant at Frankford and Orleans Street. So radio calls came out for the job. An officer responded to that location. An additional flash was put out by an officer on location. This male was stopped. The complainant was brought to the location where this male was stopped, where this male was negatively ID'd for that incident. He was still under arrest for the gun. A short time later, two other males were apprehended in regards to the actual robberies at Frankford and Orleans.

N.T., 4/10/2015, at 18.

Relying on Sergeant Armstrong's testimony that "[a]n additional flash was put out by the officer on location [and t]his male was stopped," the Commonwealth claims the "flash" information preceded Sergeant Armstrong's stop of McPherson. We are not persuaded by the Commonwealth's assertion.

We note that although there were radio calls that were played at the suppression hearing, they were not moved into evidence and are not part of the certified record. *See* N.T., 4/10/2015, at 14, 19, 28. Here, there is no evidence in the record that Sergeant Armstrong knew the source of the radio calls. Furthermore, Sergeant Armstrong's testimony did not indicate when the "additional flash" was sent, or if he relied on it in stopping McPherson. As such, we find no basis upon which to reject the trial court's determination that the only information possessed by Sergeant Armstrong at the time he stopped McPherson were two anonymous phone calls.

We next consider the Commonwealth's argument that even if the tips were anonymous, police had reasonable suspicion in this case. Here, the Commonwealth relies on, *inter alia*, **Navarette v. California**, 134 S.Ct. 1683 (U.S. 2014) and **Commonwealth v. M.Jackson**, 678 A.2d 798 (Pa. Super. 1996).

In **Navarette,** a 911 caller reported that a vehicle, identified as a silver Ford pickup truck with a specific license plate number, had run her off the road. Police dispatch then sent out a broadcast with that information. A police officer responded to the broadcast and, approximately thirteen minutes later, located the vehicle identified during the call. Five minutes later, he executed a traffic stop, although he had not observed any suspicious driving. As the officer approached the truck with a second officer

who had arrived on the scene, they smelled marijuana. In the truck bed, they discovered thirty pounds of marijuana.

The United States Supreme Court upheld the stop, ruling that the 911 call was sufficiently reliable and provided reasonable suspicion for the traffic stop. The Court held that a 911 call "bore adequate indicia of reliability for the officer to credit the caller's account," and constituted a reliable tip. *Navarette*, 134 S.Ct. at 1688. The *Navarette* Court reasoned "[a] 911 call has some features that allow for identifying and tracing callers, and thus provides some safeguards against making false reports with immunity." *Id*. at 1689.

In *M.Jackson*, an officer received a report regarding a robbery in progress with the suspect described as "wearing a black baseball hat and a black jacket." *Id.*, 678 A.2d at 799. The officer saw Jackson, who matched that description about two and one-half blocks away from the crime scene, and only five minutes after receiving the call on the radio. *Id.* at 800. After asking Jackson to stop, the officer asked him from where he was coming. *Id.* Jackson replied his girlfriend's place. *Id.* The officer frisked Jackson and recovered a gun. *Id.* This Court held that while the officer did not observe any unusual or suspicious conduct, "other integral factors … create[d] the requisite 'specific and articulable facts' that justif[ied] [the officer's] stop[.]" *Id.* at 801. These factors included that Jackson exactly fit the meager description of the suspect given over police radio, Jackson was temporally

and spatially proximate to the crime scene, the crime reported was a "serious felony," and the confrontation between Jackson and the officer occurred late in the evening in an area that was admittedly dangerous. *Id.*

Relying on ***Navarette***, the Commonwealth asserts the nature of the crime — a robbery in progress — "suggested that the report came from an eyewitness to the crime, establishing the basis of the source's knowledge. This is an important factor further supporting the reliability of the tip." Commonwealth Brief at 17–18. Relying on ***M.Jackson***, the Commonwealth argues McPherson matched the description of the suspect, pointing out that McPherson was six feet six inches tall, and wearing a white shirt and blue jeans; Sergeant Armstrong knew the location where he encountered McPherson was a "violent and crime-ridden area;"[5] and McPherson was stopped only seven minutes after the call regarding the robbery and in the vicinity of the crime.[6] ***See id.*** at 17–18. In addition, the Commonwealth asserts the circumstances of this case present even a stronger case for an investigatory stop because Sergeant Armstrong was directed to McPherson's location by a bystander who "flagged [him] down." Commonwealth's Brief at 19, *citing* N.T., 4/10/2015, at 21–22, 24, 27.

_____

[5] N.T., 4/10/2015, at 17.

[6] ***Id.*** at 23–24.

McPherson counters that the radio calls were anonymous tips, that the meaning of the bystander's finger pointing is speculative, and that Sergeant Armstrong possessed no corroborative information. McPherson, at oral argument, maintained that the report of a "robbery in progress" does not indicate contemporaneous information like the 911 call in **Navarette**. Additionally, McPherson argues **M.Jackson** made no distinction between stops based upon anonymous tips and stops based on tips from known informants. In support of his position, McPherson cites, *inter alia*, **Commonwealth v. C.Jackson**, 698 A.2d 571 (Pa. 1997), **Commonwealth v. Hawkins**, 692 A.2d 1068 (Pa. 1997) (OAJC), and **Florida v. J.L.**, 529 U.S. 266 (2000). **See** McPherson's Brief at 18–19.

In **C.Jackson**, at 10:23 p.m., police received a police radio report of a man in a green jacket carrying a gun, with no other details except location. Within two minutes of receiving the call, police arrived at the location where there were a number of individuals. The defendant was the only individual in a green jacket. There was no evidence he acted suspiciously. However, a police officer stopped the defendant and searched him. As he was being searched, a small key box fell next to him, which contained fourteen packets of cocaine. **C.Jackson, supra**, 698 A.2d at 572. The Supreme Court held that such an anonymous tip, without independent police corroboration producing reasonable suspicion of criminal activity, is insufficient to justify a stop and frisk. The Court reasoned as follows:

In [**Commonwealth v. Hawkins**, 692 A.2d 1068 (Pa. 1997)], the Philadelphia police responded to an anonymous telephone report that there was a man with a gun at the corner of Sydenham and York Streets. The suspect was described as a black male wearing a blue cap, black jeans and a gold or brownish coat. We held that such allegations, without more, did not constitute reasonable grounds for the police to suspect that the individual was armed and dangerous:

> If the police respond to an anonymous call that a particular person at a specified location is engaged in criminal activity, and upon arriving at the location see a person matching the description but nothing more, they have no certain knowledge except that the caller accurately described someone at a particular location…. The fact that a suspect resembles the anonymous caller's description does not corroborate allegations of criminal conduct, for anyone can describe a person who is standing in a particular location at the time of the anonymous call. Something more is needed to corroborate the caller's allegations of criminal conduct.

**Hawkins**, 692 A.2d at 1070. Thus the details provided by the caller in this case were insufficient, even when corroborated, to satisfy the reasonable suspicion standard.

**Id**., 698 A.2d at 574-575.

In **J.L.**, police received an anonymous tip that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." **J.L., supra**, 529 U.S. at 268. Officers proceeded to the bus stop, and, when they arrived there, they saw three black males, one of whom was wearing a plaid shirt. "Apart from the tip, the officers had no reason to suspect any of the three of illegal conduct. The officers did not see a firearm, and J.L. made no threatening or otherwise unusual movements." **Id.** Nevertheless, one officer directed J.L. to place his hands up, frisked him, and

found a gun. *Id.* The *J.L.* Court rejected modifying *Terry* to create a "firearm exception," and ruled that the stop and search violated the Fourth Amendment. *Id.* at 272–273.

Having carefully reviewed this record, we agree with the trial court that Sergeant Armstrong possessed only two anonymous tips, without any corroborating information. While the Commonwealth tries to align the report of robbery in progress with the 911 call in *Navarette*, we are not persuaded by this argument since there is no identifying information for the source that would lend the report a higher degree of reliability. Moreover, we find the decisions that address anonymous tips — *C.Jackson*, *Hawkins* and *J.L.* — to be controlling here. Additionally, the Commonwealth relies on Sergeant Armstrong's testimony that he was "flagged down" [7] by a bystander; however, this testimony only established that the officer saw the bystander was pointing towards Frankford Avenue, without any indication that he was specifically directing the officer to McPherson.[8]

Here, Sergeant Armstrong's justification for grabbing McPherson was based solely on his observations that McPherson satisfied the generic

---

[7] N.T., 4/10/2015, at 24.

[8] When Sergeant Armstrong was questioned on redirect examination as to "how [was it] this man flagged you down," he explained that as he "was coming down the block [in his police vehicle, the individual was] **pointing** in the direction towards the area of Frankford and Bellmore." N.T., 4/10/2015, at 27 (emphasis added).

description and location information reported in the police radio calls. Sergeant Armstrong observed nothing suspicious about McPherson's behavior before the stop — McPherson was simply walking down the street with a female. Therefore, we agree with the suppression court that the facts of this case warrant suppression. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/5/2016